846 So.2d 17 (2003)
Bruno J. DELEO, et al.
v.
BAYOU LAFOURCHE FRESH WATER DISTRICT and Peoples Water Service Company of Louisiana, Inc.
No. 2002 CA 0513.
Court of Appeal of Louisiana, First Circuit.
February 14, 2003.
Writ Denied May 16, 2003.
*18 O'Neil J. Parenton, Jr., Donaldsonville, for Appellees Plaintiffs.
Ricky L. Babin, Stephen P. Sheets, Gonzales, for Appellant Defendant Bayou Lafourche Fresh Water District.
Panel composed of Judges FRANK FOIL, PAGE McCLENDON and WILLIAM F. KLINE, Jr.
FOIL, J.
This appeal challenges a trial court's judgment awarding property damages to numerous persons residing along Bayou Lafourche in connection with a chemical spill in the Mississippi River. We find that the plaintiffs failed to prove that the defendant acted negligently in its handling of a benzene spill under all of the circumstances of this case, and we reverse.

BACKGROUND
On March 17, 1999, at about 5:00 p.m., the M/V F.R. Bigelow, was traveling in the Mississippi River near Baton Rouge, Louisiana, with twenty-five barges in tow, when it collided with a bridge. The barges were carrying among other chemicals, 400,000 gallons of benzene. Benzene *19 is a known carcinogen. As a result of the collision, 270,000 gallons of benzene were released into the Mississippi River. Water drinking standards, promulgated by the Environmental Protection Agency, set the maximum contaminant level (MCL) for benzene at 5.0(ppb).
The collision occurred upstream from the Walter S. Lemann Pumping Station in Donaldsonville, Louisiana, located at the head of Bayou Lafourche where it adjoins the Mississippi River. The pumping station is maintained by the Bayou Lafourche Fresh Water District (BLFWD). Because water does not freely flow into Bayou Lafourche, it is forced from the Mississippi River into the bayou by four large pumps at the station. With the pump station operation, BLFWD controls the level of water in Bayou Lafourche.
Bayou Lafourche supplies drinking water to approximately 300,000 citizens in four parishes. Peoples Water Service, Inc., a private corporation, obtains water from Bayou Lafourche to supply Donaldsonville residents with drinking water. Peoples Water is a participant in the Early Warning Organic Compound Detection System (EWOCDS). EWOCDS is a cooperative agreement between the State of Louisiana, Department of Environmental Quality (DEQ), water works and industries along the Mississippi River. The main objective of the system is to provide adequate warnings of unusual conditions in the Mississippi River to downstream drinking water suppliers.
BLFWD administrator, Mr. Kirk Cheramie, was informed of the barge accident by a DEQ officer approximately two hours after the spill. Mr. Cheramie asked DEQ to perform a "time of travel run" to ascertain when the hazardous chemical would reach the Donaldsonville area, and later learned that the projected time of arrival was 4:00 the next morning. He was also informed that EWOCDS had been activated. Mr. Cheramie ordered the pumping station to shut down at 2:00 a.m.
On March 18, the following events transpired. Early in the morning, Mr. Cheramie went to Baton Rouge to the Command Center to discuss the situation in Donaldsonville. Mr. Cheramie later obtained information that samples at Dow Chemical and Peoples Water ranged from 0.5 ppb to 1.0 ppb. Because the samples showed levels of benzene below water drinking standards, Mr. Cheramie ordered the pumping station to resume operations. That evening, Mr. Cheramie received a call from Mr. Norbert Redmond of Peoples Water. Mr. Redmond questioned the decision to resume pumping, informing Mr. Cheramie that sampling at Peoples Water was only done during the day time and that there could be other toxic chemicals in the water that had not yet been tested for concentrations. Mr. Cheramie informed Mr. Redmond that he would shut down the pumping station until he could ascertain the concentrations in person through written, signed test results, and subsequently ordered the pumping station to shut down until further notice.
On March 20, Mr. Cheramie was informed by DEQ that the barge would be offloaded that day, which could result in another large spill during the unloading operation. The next day, Mr. Cheramie learned that the latest sampling and testing at Peoples Water and Dow showed no traces of benzene. He also learned that the barge had not been offloaded, and ordered that pumping resume at pre-accident volumes. He requested to be notified as soon as the unloading operations began and of any spillage that may have occurred during those operations.
On March 25, Mr. Cheramie was apprised that a spill had occurred overnight in the preparation of barge unloading operations, *20 resulting in the release of an undetermined amount of contaminants into the river. The next day, Mr. Cheramie was informed that measurable levels of benzene were present on the latest test, and he decided to keep the station shut down until the barge was up-righted and DEQ certified that the plume of any spillage passed the pumping station's intakes in the river.
On March 28, eleven days after the spill, the barges were up-righted and removed to a repair facility. DEQ determined it would take twelve hours for the plume to pass by Donaldsonville. The last trace of contaminants was measured at 7:00 the next morning, and several hours later no trace could be detected. At 10:00 that morning, the pumping station went back on line.
During the time in question, Mr. Cheramie ordered pumping to resume for twenty-thirty minute intervals on three occasions at the request of Peoples Water to refill the water company's reservoir.
Because the pumps had been shut down, the water levels in Bayou Lafourche dropped. At one point, the bottoms of the bayou were exposed. Numerous residents who own and reside on property contiguous to Bayou Lafourche filed this lawsuit against BLFWD and Peoples Water, seeking to recover damages arising out of the rise and fall of water levels in Bayou Lafourche. Specifically, they claimed that BLFWD was negligent in manipulating the water level in Bayou Lafourche to unnecessarily expose the bayou bottom when no real benzene danger existed. They alleged that the fluctuating water levels in Bayou Lafourche caused their properties to cave into the bayou, and sought to recover damages for repair costs to reconstruct the caved-in portions of their properties, as well as damages to bulkheads and improvements, loss of shrubbery, loss of use and enjoyment of their properties and mental anguish as a result of the damage to their properties.
At trial, BLFWD disputed whether plaintiffs in fact owned the portion of land they asserted had been damaged by the fluctuating water levels, contending that the subject properties were owned by the State of Louisiana. The trial judge rejected this argument, and found BLFWD to be at fault in causing plaintiffs' property damages. The trial judge also found Peoples Water to be negligent, and apportioned 70% fault to BLFWD and 30% fault to Peoples Water.
The judge awarded owners of fourteen properties the cost or a portion of the cost to reconstruct the caved-in portions of their properties as reflected in repair estimates introduced into evidence. The judge also awarded the owners of seven properties mental anguish damages totaling $18,750.00.
This appeal, taken by BLFWD, followed. BLFWD argues that plaintiffs failed to meet their burden of proving ownership of the land allegedly damaged by it actions. Further, BLFWD asserts that the trial judge erred in finding it was negligent in its handling of the benzene spill, in failing to assess some fault against third parties who created the disaster, and in failing to accord statutory immunity to BLFWD, a political subdivision of the State of Louisiana. Lastly, BLFWD claims that the damages awarded to plaintiffs were excessive.
We find merit in BLFWD's argument that plaintiffs failed to prove they own the land that caved-in as a result of the fluctuating water levels in Bayou Lafourche. However, for the purpose of this appeal, we shall discuss only BLFWD's challenge to the liability ruling, and pretermit discussion of all other assignments of error.

*21 NEGLIGENCE
In order to recover against a defendant in a negligence action under La. Civ.Code art. 2315, the plaintiff bears the burden of proving fault, causation and damages. Wainwright v. Fontenot, XXXX-XXXX, p. 5 (La.10/17/02), 774 So.2d 70, 74. Negligence must be established with reasonable certainty and by a preponderance of the evidence; a showing of the mere possibility or probability of negligence is insufficient. Fallon v. Dorsett, 344 So.2d 434, 436 (La.App. 1 Cir.1977).
At issue in this appeal is whether plaintiffs satisfied their burden of proving negligence on BLFWD's part by a preponderance of the evidence. Negligence is that conduct falling below the standard of care established by law for the protection of others against an unreasonable risk of harm. It is the breach of a duty owed to another to protect that person from the particular harm that ensued. Classert v. Butler, 98-1991, p. 3 (La.App. 1 Cir. 11/5/99), 746 So.2d 787, 789. The determination of whether a duty exists under a particular set of circumstances is a question of law. Anderson v. Piccadilly Cafeteria, Inc., XXXX-XXXX, p. 3 (La.App. 1 Cir. 9/28/01), 804 So.2d 75, 77, writ denied, XXXX-XXXX (La.4/19/02), 813 So.2d 1084. Once the applicable standard of care has been established, negligence is a question of fact, which must be determined on a case by case basis according to the particular facts and circumstances therein. Classert v. Butler, 98-1991 at p. 4, 746 So.2d at 789.
By Act 113 of the 1950 Legislative Session, BLFWD was created for the purpose of furnishing fresh water from the Mississippi River to localities within the boundaries of the District. The parties dispute whether BLFWD owed the plaintiffs a duty to maintain a certain water level in Bayou Lafourche, and whether BLFWD's decision to turn the pumps on and off was unreasonable.
The trial judge apparently premised liability in this case on the fact that the morning after the spill, Mr. Cheramie received a report of concentrations of benzene at only 0.5 ppb. The judge stressed that Peoples Water had no direct legal control over the BLFWD administrator, but was consulted on a regular basis and its on/off requests were routinely honored. The judge also took issue with the fact that there was no evidence in the record that BLFWD had an emergency plan in place.
However, whether BLFWD acted negligently in its handling of the benzene spill can only be determined by examining all of the facts and circumstances of this case. Mr. George Pintado, an environmental chemist with the EWOCDS program, was involved in the monitoring of benzene levels at Peoples Water after the spill. He attested that the benzene spill in this case presented a unique situation. In his usual experience with EWOCDS, the leak or discharge was sudden and at one point in time, thus making it susceptible to measurement. However, in this case, the discharge of benzene into the river was gradual and of a long duration because the barges were leaking unknown amounts over a long period of time. There was no way, he stated, to ascertain the true nature of this spill, particularly in light of the dynamic nature of the Mississippi River. Because of these circumstances, the chemical would not evenly disburse and water readings or water samples taken at one point would not guarantee similar readings at a different location. Thus, he attested, there could have been pockets of higher/lower benzene concentrations only short distances away from where the samples were taken.
*22 The evidence also revealed that nine days after the accident, on March 25, benzene concentrations reached 3.8 ppb at Peoples Water. Mr. Norbert Redmond, the manager of Peoples Water, testified that he advised Mr. Cheramie to turn the pumps off only on March 18, one night after the spill, because of the atypical situation it presented, in that the barge was leaking sporadically and the river was in flood stage.
Plaintiffs did not offer any scientific evidence in support of their assertion that no true environmental hazard existed. Rather, the record demonstrates Mr. Cheramie was faced with an environmental emergency, upon which he had little time to act. Mr. Cheramie acted diligently in his attempts to obtain information on benzene concentrations in the river. Mr. Cheramie was advised that there were factors other than the actual test results that may influence the amount of benzene in the river at the pumping station's intake. He chose to take the safe route and shut down the pumps until he was provided with more accurate information to protect the safety of 300,000 residents who rely on Bayou Lafourche for their drinking water. Although Mr. Cheramie's decisions may have caused the water levels in Bayou Lafourche to fluctuate, they did not unreasonably cause damage to property owners along the bayou, and the trial judge erred in finding otherwise.
After a thorough review of the record, in light of the unique situation presented by the benzene spill in this case, we find that plaintiffs simply failed to prove by a preponderance of the evidence that BLFWD acted negligently in its decision to shut down the pumping station to protect the public health. Accordingly, that portion of the judgment assessing 70% fault to BLFWD must be reversed.

CONCLUSION
Based on the foregoing, the judgment of the trial court against BLFWD is reversed. All costs of this appeal are assessed to plaintiffs.
REVERSED.
Judge WILLIAM F. KLINE, Jr., Retired, serving Pro Tempore by special appointment of the Louisiana Supreme Court.