HIGGINBOTHAM, J.
These consolidated matters arose out of a high-speed police pursuit that resulted in a fatal crash. The plaintiffs appeal the dismissal of their personal injury claims following a seven-day jury trial that culminated in a jury verdict finding no liability on the part of the sole remaining defendant, the Louisiana State Police.
FACTS AND PROCEDURAL HISTORY
On March 7, 2004, a fourteen-year-old unlicensed young man, Sylvester Bristol, Jr. ("Sylvester"), was driving his mother's Oldsmobile in Gonzales, Louisiana. It was approximately 7:54 p.m., when Sylvester was stopped behind a few other vehicles in the left turn lane at an intersection on northbound Airline Highway. While stopped at the intersection, Officer Duane Carpenter of the City of Gonzales Police Department ("the City") observed that the Oldsmobile did not have its headlights activated. When the stoplight turned green and the Oldsmobile had cleared the intersection, Officer Carpenter moved in behind the Oldsmobile and turned on the blue overhead lights on his police car. Sylvester continued to drive without slowing, stopping, or pulling over.
While following the Oldsmobile around various streets throughout Gonzales, Officer Carpenter requested information about the vehicle's license plate from the City's dispatch. He was informed that the vehicle had not been reported stolen. He also learned that the Oldsmobile was registered to Donna Carter Bristol, but Officer Carpenter had no idea who was actually driving the vehicle. When it was apparent that Sylvester was not stopping, that he was driving in the center of the road at times, and that he was driving through several stop signs and red lights without stopping, all without headlights turned on, Officer Carpenter decided to activate his siren, and persist in his pursuit of the Oldsmobile. Additionally, Officer Carpenter notified the City's dispatch that the ongoing pursuit was headed toward Interstate 10 ("I-10"). At that point, Officer Carpenter requested the assistance of the Louisiana State Police ("LSP"). At approximately 7:59 p.m., Sylvester entered I-10 and began *236 speeding westbound toward Baton Rouge without his headlights on, even though it was dark outside.
Once Sylvester was driving on I-10, the City's police officers slowed to allow the LSP to take over the pursuit around the Highland Road entrance to I-10. State Troopers attempted to put down a spike strip across the interstate ahead of the Highland Road interchange, but they failed to get set up before Sylvester passed by. At approximately 8:04 p.m., Trooper Matthew Sinanan pulled onto I-10 westbound at the Highland Road entrance ramp, with his blue overhead lights and siren activated. Trooper Sinanan was able to position himself in front of Sylvester's vehicle in an attempt to slow the Oldsmobile down. According to the trooper at that point in the pursuit on I-10, their speeds ranged anywhere from 80-100 miles per hour and all the while, Sylvester repeatedly attempted to pass Trooper Sinanan. The trooper maneuvered back and forth between lanes to prevent Sylvester's passage. Suddenly Sylvester drove onto the grassy median between the eastbound and westbound lanes, in an apparent move to pass Trooper Sinanan. While driving in the median at a slower speed, somewhere between 50-70 miles per hour, the trooper observed Sylvester moving his hands back and forth. He also made direct eye contact with Trooper Sinanan before grabbing the Oldsmobile's steering wheel and seemingly intentionally jerking the vehicle back to the right and onto the travel surface of I-10. In doing so, the Oldsmobile sideswiped the back driver's side of Trooper Sinanan's vehicle, causing the trooper to slow down long enough to allow Sylvester to pull ahead.
Meanwhile, Trooper Henry Reavis, entered I-10 eastbound at Highland Road and performed a U-turn on the east side of the interstate to join the pursuit of the Oldsmobile. Trooper Reavis also had his blue overhead lights and siren activated as he passed the City's officers, Trooper Sinanan, and Sylvester, to take the lead in an attempt to slow the Oldsmobile down. Trooper Sinanan followed 5-6 car lengths behind Sylvester. The Oldsmobile continued to erratically swerve from side to side in the travel lanes, until Trooper Reavis made the decision to allow Sylvester to pass him. Trooper Reavis persisted in the pursuit, however, he did so by following Sylvester closely rather than trying to regain the lead. At this point in the pursuit, the speeds ranged anywhere from 60-100 miles per hour, with Sylvester flashing his lights for other cars ahead of him to move out of his way. Just prior to the Siegen Lane exit on I-10, Sylvester slammed on his brakes, causing Trooper Reavis's vehicle to collide with the rear of the Oldsmobile. Sylvester then faked an exit at Siegen Lane, but he remained speeding on I-10 toward the city of Baton Rouge. Just after the Siegen Lane exit, Sylvester slammed on his brakes a second time, causing another impact with Trooper Reavis, who was following within 1-2 car lengths behind the Oldsmobile at that particular time.
A mere 13 minutes after the pursuit began in Gonzales, and 3-4 minutes after the LSP became involved in the pursuit, the Oldsmobile reached the Bluebonnet exit on I-10 westbound. Sylvester once again faked an exit at Bluebonnet, but then he made an abrupt left turn in front of Trooper Reavis and crossed into the median headed directly for the eastbound lane of I-10, as if he were attempting a U-turn to head back toward Gonzales on the interstate. At the exact same time that Sylvester was entering the median and *237 then the eastbound lane of I-10, a Chevrolet Impala driven by Kimberly McKnight, was headed eastbound on I-10 toward New Orleans, approaching the Bluebonnet interchange at a speed of approximately 65-70 miles per hour. Kimberly's vehicle contained seven passengers, who were all headed home from a family wedding. At some point in the median, Sylvester lost control of the Oldsmobile, causing the Oldsmobile to rotate clockwise at a high rate of speed (approximately 60-70 miles per hour) into the oncoming path of Kimberly's vehicle. The Oldsmobile was broad-sided on the driver's side door and Sylvester died upon impact. All of the passengers in Kimberly's vehicle were severely injured.
Following the accident, three lawsuits were filed, all seeking damages for bodily injuries. Kimberly and her various passengers filed two of the lawsuits, and one of the lawsuits was filed by Sylvester's parents. All three lawsuits were consolidated for trial, but by the time the jury trial occurred ten years later, in September 2015, the only remaining defendants were the City and the LSP. After the fourth day of trial, the City reached a settlement agreement with the plaintiffs and the City was dismissed. At the conclusion of the trial, the jury returned a verdict in favor of the LSP, finding no liability because it determined that the LSP had not been grossly negligent during the pursuit of Sylvester. A judgment in favor of the LSP was signed by the trial court on October 6, 2015. The plaintiffs moved for a new trial, but it was denied. Not all of the plaintiffs filed a motion for appeal; however, the Dabney plaintiffs (Barbara Dabney, Shannon Bowers, Lawrence and Kimberly McKnight, individually and on behalf of their minor child, Kayla McKnight, and Ta'Ryan Singleton) appealed the judgment dismissing their personal injury claims that was rendered in accordance with the jury's verdict.[1]
ASSIGNMENTS OF ERROR
The Dabney plaintiffs contend that the trial court erred by instructing the jury that the applicable standard of care from La. R.S. 32:24 was "gross negligence/reckless disregard" and, alternatively, that the jury erred by not finding that the LSP was grossly negligent in the pursuit of Sylvester. The Dabney plaintiffs also urge that the trial court erred in failing to grant a mistrial when one of the LSP's witnesses mentioned that a child was unrestrained in Kimberly's vehicle, apparently in violation of a prior motion in limine ruling. Finally, the Dabney plaintiffs assign error to the trial court's exclusion of testimony by Colonel Terry Landry, a witness who would have ostensibly opined about several procedural violations on the part of the LSP during the pursuit of Sylvester.
LAW AND ANALYSIS
Interpretation of La. R.S. 32:24
Louisiana Revised Statute 32:24 is known as the emergency vehicle exception to the Louisiana Highway Regulatory Act. The purpose of this statute is to provide a qualified statutory immunity from liability to drivers of emergency vehicles, under very specific circumstances. See Rabalais v. Nash, 2006-0999 (La. 3/9/07), 952 So.2d 653, 662. The statute, with emphasis added, provides as follows:
A. The driver or rider of an authorized emergency vehicle, when responding to an emergency call, or when in the pursuit of an actual or suspected violator of the law, or when responding *238 to, but not upon returning from, a fire alarm, may exercise the privileges set forth in this Section, but subject to the conditions herein stated.
B. The driver or rider of an authorized emergency vehicle may do any of the following:
(1) Park or stand, irrespective of the provisions of this Chapter.
(2) Proceed past a red or stop signal or stop sign, but only after slowing down or stopping as may be necessary for safe operation.
(3) Exceed the maximum speed limits so long as he does not endanger life or property.
(4) Disregard regulations governing the direction of movement or turning in specified directions.
C. The exceptions herein granted to an authorized emergency vehicle shall apply only when such vehicle or bicycle is making use of audible or visual signals, including the use of a peace officer cycle rider's whistle, sufficient to warn motorists of their approach, except that a police vehicle need not be equipped with or display a red light visible from in front of the vehicle.
D. The foregoing provisions shall not relieve the driver or rider of an authorized vehicle from the duty to drive or ride with due regard for the safety of all persons, nor shall such provisions protect the driver or rider from the consequences of his reckless disregard for the safety of others.
This statute has been interpreted numerous times; however, the most definitive and most-cited interpretation, was made by the Louisiana Supreme Court in Lenard v. Dilley, 2001-1522 (La. 1/15/02), 805 So.2d 175, 178-79. In Lenard, 805 So.2d at 178, the supreme court reiterated the well-known concept that the starting point for the interpretation of any statute is the language of the statute itself. The supreme court went on to examine each section of the statute, and outlined the circumstances in which the driver of an emergency vehicle is granted particular driving privileges, also known as a qualified immunity. See Lenard, 805 So.2d at 179. In the case sub judice, the pertinent circumstances for the LSP's possible privilege/immunity involve their response to an emergency call (by the City) and the pursuit of an actual or suspected violator of the law (as indicated by the City and then observed by the LSP). See La. R.S. 32:24(A). In Lenard, the supreme court also described the privileges granted to an emergency vehicle driver, when the driver's actions fit the circumstances outlined in subsection (B) of the statute. Those privileges allow an emergency vehicle driver to park, proceed past red or stop signals (after slowing down or stopping as may be necessary for safe operations), exceed the maximum speed limits so long as the driver does not endanger life or property, and disregard regulations governing the direction or movement or turning in specified directions. Id. Additionally, the supreme court stated that the exceptions apply only when the authorized emergency vehicle's driver makes use of audible or visual signals sufficient to warn motorists of their approach. Id.See La. R.S. 32:24(C).
The question to focus on then, is what standard of care is to be applied to an emergency vehicle driver who qualifies under the provisions subsections (A) through (C) of La. R.S. 32:24. Lenard, 805 So.2d at 179. The standard of care is found in subsection (D) of the statute. The driver of an authorized emergency vehicle is not relieved from the duty to drive with due regard for the safety of all persons, nor is the driver protected from the consequences *239 of his reckless disregard for the safety of others. The supreme court noted that it is the use of "due regard" and "reckless disregard" in the same sentence, which has caused confusion. Id. The supreme court then clarified that La. R.S. 32:24(D) sets out two standards of care for an emergency vehicle driver depending on the circumstances of the case. If, and only if, an emergency vehicle driver's actions fit into subsections (A), (B), and (C) of La. R.S. 32:24, will an emergency vehicle driver be held liable only for actions which constitute "reckless disregard" for the safety of others (also known as "gross negligence" or the want of even the slightest care and diligence). In contrast, if the driver's conduct does not fit into those subsections, then the emergency vehicle driver's actions will be determined by a standard of "due care," (which is synonymous with ordinary negligence). Lenard, 805 So.2d at 180.
The legislature has obviously recognized the high social value and premium placed on protection and rescue efforts by drivers of emergency vehicles, and has set forth those circumstances where the "reckless disregard" standard of care applies. Lenard, 805 So.2d at 180. Applying an ordinary negligence standard to emergency vehicle drivers in all cases would restrict the effectiveness of individuals responding to emergency situations and would unduly restrain emergency vehicle drivers from performing a vital role in society. Id. However, the supreme court correspondingly recognized that applying a reckless disregard standard in all situations would be problematic and could endanger public safety. Id. , 805 So.2d at 180-81. That is why there is a dual standard of care, depending upon the circumstances. Whether or not the conduct of an emergency vehicle driver should be gauged by a reckless disregard or ordinary negligence standard, is "a question to be determined by the jury after being instructed on the law. " Id. , 805 So.2d at 181 (Emphasis added).
In the instant case, the trial court, over the objection of the plaintiffs, gave a jury instruction consistent with the "reckless disregard for the safety of others" under the totality of the circumstances.[2] Likewise, the jury's verdict form included the first question: "Do you find that [the LSP] were grossly negligent in that they *240 acted with reckless disregard for the safety of others on March 7, 2004?" The jury answered "No" in a 10-2 vote. After that decision was made, no further determination was necessary by the jury, and the plaintiffs' claims were dismissed by the trial court in a judgment rendered in accordance with the jury verdict. The plaintiffs filed a motion for new trial arguing that the trial court gave an erroneous jury instruction on the standard of care, but the motion was denied.
Now on appeal, the Dabney plaintiffs argue again that the trial court gave an erroneous jury instruction concerning the applicable standard of care. The LSP, in contrast, contends that the undisputed evidence presented at trial supported the criteria for the reckless disregard standard. However, based on the directive from the Louisiana Supreme Court in Lenard, we must agree with the Dabney plaintiffs. We conclude that the jury instruction concerning the LSP's standard of care was inadequate in that it improperly removed the determination of the standard of care from the jury.[3] See Lenard, 805 So.2d at 181. The standard of care in this case is a factual question that should have been determined by the jury based on the evidence.
Inasmuch as the application of the incorrect standard of care interdicts the jury's fact finding process as to liability, we conclude that we must perform a de novo review. See Lachico v. First Nat. Bank Shares, Inc. , 95-2124 (La. App. 1st Cir. 4/30/96), 673 So.2d 305, 308. When an appellate court has all of the facts before it from a complete trial court record, a trial court's erroneous jury instruction does not warrant a remand for a new trial. See Gonzales v. Xerox Corp., 254 La. 182, 320 So.2d 163, 165 (1975). Further, it is only when a view of the witnesses is essential to a fair resolution of conflicting evidence should the case be remanded for a new trial. Jones v. Black , 95-2530 (La. 6/28/96), 676 So.2d 1067 (per curiam). In this case a complete trial court record exists, and physically observing the witnesses is not essential to a fair determination of the case. Thus, we will review the record de novo to determine whether the LSP is entitled to a qualified statutory immunity under the reckless disregard standard of care or whether a finding of liability is warranted due to a breach of ordinary negligence.
Our review of the evidence demonstrates a finding that the LSP troopers were engaged in the lawful pursuit of a driver who had violated multiple motor vehicle laws both before and after the LSP became involved in the pursuit. There is no conflicting evidence regarding Sylvester's erratic driving without headlights turned on, speeding, swerving into and out of the median, slamming on his brakes in front of the troopers, and refusing to stop, slow, or pull aside for the troopers who had their overhead lights and sirens engaged *241 throughout the entire pursuit. The record further establishes that Sylvester had multiple opportunities to slow or stop the Oldsmobile throughout the entire 13 minutes that he was being pursued, but he inexplicably chose not to stop.
The testimony of each law enforcement officer involved in the pursuit was similar in that they all indicated that they would have conducted themselves in the same manner if faced with another situation analogous to the pursuit of Sylvester, because Sylvester intentionally placed the public, the police, and himself in danger by erratically fleeing from law enforcement officers. Trooper Craig Jewell, who was a sergeant with the LSP Troop A responding to the incident and was ultimately in charge of the pursuit that night, testified that the LSP did not initiate the pursuit of Sylvester. He explained that the LSP continued the pursuit after the City requested the LSP's assistance. Trooper Jewell emphasized that the continuance of the pursuit was justified since Sylvester would not stop, he was not using his headlights, he had collided with troopers' vehicles, and the situation was escalating as Sylvester erratically sped toward Baton Rouge.
The record reveals competing expert testimony. The plaintiffs offered an expert in traffic accident reconstruction and police emergency vehicle driving, John Painter, who testified that the LSP were negligent in their pursuit of Sylvester in that they followed him too closely for such high rates of speed and they were too aggressive when they pulled in front of Sylvester at various points in the pursuit. In other words, Mr. Painter explained that the LSP should have backed off and followed Sylvester instead of trying to force him to slow or stop. In Mr. Painter's opinion, there was no way of knowing what caused Sylvester to lose control, and it was possible that contact between Trooper Reavis and Sylvester caused the Oldsmobile to go off into the median and the oncoming lane of traffic. Mr. Painter stated that the troopers did not follow their own pursuit training by attempting to slow Sylvester with a moving roadblock maneuver without permission from a supervisor, and they never reported the collisions between Sylvester's vehicle and the troopers' vehicles. Contrary to the evidence in the record, Mr. Painter also testified that Sylvester only began to speed and make dangerous movements when the LSP became involved in the pursuit. However, the record reveals that the LSP troopers and the City police officers involved in the pursuit, unanimously indicated that Sylvester began to speed, without headlights on, once he entered I-10, while he was being pursued by law enforcement officers several miles before the LSP became involved at Highland Road. Prior to entering I-10, Sylvester was also driving dangerously by running stop signs, driving through red lights, driving in the center of the road, and he was doing all of those dangerous maneuvers without his headlights activated.
The LSP offered three expert witnesses. The first expert witness was Stephen Allen Irwin, who was accepted as an expert in accident reconstruction. Mr. Irwin was of the opinion that the most probable cause for Sylvester leaving the interstate and colliding with the other vehicle was due to his own steering maneuvers, and had nothing to do with any prior impact with the LSP vehicles.
The second expert witness for the LSP was Chris Sutterfield, who was accepted as an expert in the field of police pursuit policy. Mr. Sutterfield opined that the LSP troopers' actions in this pursuit were consistent with officers engaged in attempting to apprehend a violator of the law, and that their actions that night were reasonable under the circumstances. After the *242 request for assistance came in from the City, Mr. Sutterfield testified that it was appropriate for the LSP to join the pursuit on the interstate, because the driver of the Oldsmobile was eluding police, which is a reasonable reason to continue the pursuit. Furthermore, because the Oldsmobile did not have headlights turned on, Mr. Sutterfield stated that it was appropriate for the LSP troopers to get in front of the Oldsmobile in order to warn other motorists and to attempt to slow the violator. Mr. Sutterfield continued by stating that fleeing police on an interstate at night, without headlights, is a danger to the public and constitutes reckless behavior. Mr. Sutterfield testified that Sylvester was in complete control of the pursuit and the ultimate decision of whether or not to pull over. Mr. Sutterfield concluded that given the totality of the circumstances during the quick 4 minutes that the LSP were involved in the pursuit, the troopers acted reasonably, with no time to reflect on a different plan.
The LSP's third expert witness was a mechanical engineer, Larry Peterson, who was accepted as an expert in the field of automotive engineering. Mr. Peterson testified that Sylvester's vehicle was not knocked out of control by a trooper, so he disagreed with the plaintiffs' expert witness's assumptions and conclusions. Mr. Peterson concluded that all of the evidence pointed to no contact between Sylvester and Trooper Reavis near the Bluebonnet exit area where the collision with the other vehicle occurred.
Our exhaustive review of all the evidence reveals that the LSP was not responsible for this terrible and unfortunate accident. The LSP was entitled to have the higher standard of care applied in this case, because they were pursuing an actual violator of the law with the use of audible and visual signals that were sufficient to warn motorists of their approach. Furthermore, we find that the evidence viewed as a whole establishes that the LSP were not grossly negligent in that they did not show a "reckless disregard" for the safety of others in this pursuit that ended so tragically. Even taking the additional step of applying the ordinary negligence standard as the Dabney plaintiffs would have us do, we still conclude that the LSP and its troopers were not at fault for the accident. Instead, it was the decision of Sylvester to flee law enforcement officers in an erratic and dangerous fashion that was the sole cause of this accident.[4] Sylvester placed himself, the public, and all involved law enforcement personnel in immediate danger by driving dangerously at high rates of speed without lights and without a license. We specifically find no evidence to support the Dabney plaintiffs' allegations that the troopers were negligent in following their own pursuit policies and procedures in this quick, high-speed pursuit. Simply put, the LSP troopers were not "grossly" or "ordinarily" negligent; they acted reasonably and did their job as they were trained to do in a highly dangerous situation. Therefore, we conclude that the immunity provided in the statute, La. R.S. 32:24, is applicable and relieves the troopers and the LSP of responsibility in this case.
Motion for Mistrial
In an alternative argument, the Dabney plaintiffs argue that the trial court erred in failing to grant the plaintiffs' motion *243 for a mistrial after one of the law enforcement officers stated that upon arrival at the scene of the accident, he observed a trooper performing CPR on an unrestrained child. We note that the plaintiffs moved for a mistrial, which was denied by the trial court for lack of a showing of prejudice. The plaintiffs chose not to strike a juror, who during voir dire, indicated a potential bias concerning a person operating a vehicle carrying seven passengers, who obviously did not have seatbelt restraints for all of the passengers. However, the juror was questioned extensively about his potential bias and he indicated that he could follow the law and the trial court's instructions. The plaintiffs thought that the entire issue of seatbelt restraints would not be mentioned during the trial, after the trial court ruled on a motion in limine that such evidence would not be placed before the jury.
A trial court has great discretion in determining whether to grant a mistrial, since mistrials are not a matter of right. Estate of Cristadoro ex rel. Jones v. Gold-Kist, Inc. , 2001-0026 (La. App. 4th Cir. 1/23/02), 819 So.2d 1034, 1049, writ denied, 2002-1325 (La. 9/13/02), 824 So.2d 1171. Motions for mistrial should be granted upon proof of prejudicial misconduct occurring during a jury trial, which cannot be cured by admonition or instructions to the jury. Id. In the jury instructions offered in this case, the trial court specifically instructed the jurors to not consider evidence of the use or failure to use seatbelts or restraints, or any evidence concerning the number of occupants in any vehicle, in their determination of fault or damages. Because the jury was thoroughly instructed on the issue, we find no abuse of discretion in the trial court's denial of the plaintiffs' motion for mistrial.
Exclusion of Testimony by Witness
In their final assignment of error, the Dabney plaintiffs argue that the trial court erred when it excluded the testimony of a potential witness, Colonel Terry Landry, who was the Superintendent of the LSP from the years 2000 until 2004. The Dabney plaintiffs claim that Colonel Landry's testimony was relevant to the ultimate issue of whether the LSP caused or contributed to the cause of the accident, as well as the reasonableness of the troopers' actions in the pursuit of Sylvester in the context of trooper training and pursuit policy/procedure. The record reveals that the testimony of Colonel Landry was actually the subject of a pretrial Daubert/Foret[5] Motion and Motion in Limine filed by the LSP to exclude the witness's expert opinions. The trial court granted the LSP's motion to exclude the testimony, because it found that Colonel Landry's report and deposition testimony did not reflect any opinion that the troopers had violated pursuit policies that caused the accident in question. Thus, the trial court determined that the testimony was irrelevant to the question of whether the troopers' conduct was reasonable in light of the totality of the circumstances, and would only serve to mislead and confuse the jury. Additionally, Colonel Landry acknowledged he lacked any specialized education in the area of police pursuits.
The standard of review for evidentiary rulings of a trial court is abuse of discretion, and a trial court's ruling will not be disturbed unless it is clearly erroneous. See Devall v. Baton Rouge Fire Department , 2007-0156 (La. App. 1st Cir. 11/2/07), 979 So.2d 500, 503. See also *244 Brandt v. Engle , 2000-3416 (La. 6/29/01), 791 So.2d 614, 620-621. Further, the trial court's decision to admit or exclude potential expert testimony is within the sound discretion of the trial court, and its judgment will not be disturbed by an appellate court unless it is clearly erroneous. La. Code Evid. art. 702, comment (d); Devall , 979 So.2d at 503. Notably, the plaintiffs did not make a proffer of the disputed testimony at trial, which would have allowed this court additional information to review the trial court's ruling. Based on our review of the record, we do not find that the trial court clearly erred in excluding the testimony of Colonel Landry, who apparently would have provided the jury with his personal opinion about what he would have done in the same situation while employed with the LPS.
CONCLUSION
In finding no liability on the part of the LSP, we hereby affirm the trial court's judgment rendered in accordance with the jury's verdict that dismissed the Dabney plaintiffs' claims with prejudice. All costs of these consolidated appeals are assessed to the Dabney plaintiffs.
AFFIRMED.

Sylvester's mother, Donna Carter Bristol, filed a motion for appeal, but no appeal was granted or docketed on her behalf, and she did not file any brief in this court.

The trial court's instructions regarding the duty imposed on the LSP in this case was actually quite lengthy:
When in pursuit of a suspected violator of the law, drivers of emergency vehicles or law enforcement officers may be held liable only if they exhibit reckless disregard for the safety of others. This statute does not relieve law enforcement officers from the duty to drive with due regard for the safety of all persons, nor shall this statute protect law enforcement officers from the consequences of his reckless disregard for the safety of others. Reckless disregard requires conduct that is more severe than ordinary negligent conduct. Conduct that amounts to a reckless disregard for the safety of others, in effect, is gross negligence, and gross negligence is defined as the want of even slight care and diligence. It is the want of that diligence which even careless men are accustomed to exercise. That is the standard of care applicable to this case, and in order for the plaintiffs to prevail on the element of fault, they must prove by a preponderance of the evidence that the defendant law enforcement officers were grossly negligent in the pursuit of [Sylvester's] vehicle or that their conduct amounted to a reckless disregard for the safety of others. When determining whether a police officer breached his duty to a particular plaintiff, the determining fact is not whether the officer complied with or violated departmental policy, but rather, this fact may be considered when determining whether the police officers' [actions] constituted a reckless disregard for the safety of others under the totality of circumstances.

We acknowledge that in many cases, the determination of whether a duty exists under a particular set of circumstances is ordinarily a mixed issue of law and fact. The determination of the standard of care to which the defendant must be held is often a question of law, although its legal formulation is guided by proved facts. Once the applicable standard of care has been established, negligence is a question of fact, which must be determined on a case-by-case basis according to the particular facts and circumstances that are presented. See Deleo v. Bayou Lafourche Fresh Water Dist. , 2002-0513 (La. App. 1st Cir. 2/14/03), 846 So.2d 17, 21, writ denied, 2003-0695 (La. 5/16/03), 843 So.2d 1132. However, when it comes to the standard of care for emergency vehicle drivers, the supreme court has expressly stated that it is a question to be determined by the jury/factfinder. See Lenard , 805 So.2d at 181.

Drivers are required to yield the right-of-way, immediately drive to the side of the road, and stop upon the immediate approach of authorized emergency vehicles making use of audible or visual signals. See La. R.S. 32:125(A). This duty arises when a motorist observes or hears, or under the circumstances should have observed or heard, the audible or visual warnings. Griffin v. City of Monroe , 46,229 (La. App. 2d Cir. 4/13/11), 61 So.3d 846, 850.

See Daubert v. Merrell Dow Pharmaceuticals, Inc. , 509 U.S. 579, 589, 113 S.Ct. 2786, 2795-2799, 125 L.Ed.2d 469 (1993), and State v. Foret , 628 So.2d 1116, 1121-1123 (La. 1993), for the guidelines for admissibility of an expert's opinions.